UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RODERICK HAROLD PERSON,

Petitioner,                                              Case Number 11-13112
                                                        Honorable Thomas L. Ludington
v.

CARMEN PALMER,

Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS
CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Roderick Harold Person, confined at the Michigan Reformatory in Ionia,

Michigan, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

through his attorneys Kristoffer W. Tieber and F. Martin Tieber. Petitioner was convicted by a

jury in the Alpena County Circuit Court of second-degree murder, Mich. Comp. Laws § 750.317,

and operating a vehicle under the influence of liquor (OUIL) causing death, Mich. Comp. Laws §

257.625(4).[1] Petitioner was sentenced to sentences of fifteen to thirty years in prison on the

second-degree murder conviction and seven to fifteen years on the OUIL causing death

conviction. Petitioner contends that there was insufficient evidence to support his conviction for

second-degree murder. For the following reasons, the petition will be denied.

**I**

Petitioner was convicted following a jury trial in the Alpena County Circuit Court. The

facts of the case were recited by the Michigan Court of Appeals and are presumed correct on

---

[1] In passing, the Court notes that while one person died because of Petitioner's actions, he was convicted of two offenses arising out of this death. Petitioner does not challenge his dual convictions of second-degree murder and OUIL causing death. *See People v. Werner*, 659 N.W.2d 688, 694 (Mich. Ct. App. 2002) (holding that convictions of second-degree murder and OUIL causing death did not violate double jeopardy).

habeas review pursuant to 28 U.S.C. § 2254(e)(1).  *See Wagner v. Smith*, 581 F.3d 410, 413 (6th

Cir. 2009).  The court of appeals reports:

> On July 19, 2007, Person and his friend, Victor Gornall, Jr., went to the Dry Dock bar in Alpena at approximately 2:00 a.m.  Person and Gornall had been drinking at Person's home before arriving at the bar.  Person persistently asked the bartender for a drink, but was not served any alcohol at the bar because he arrived after last call.

> Jean Anderson, Person's neighbor was also a patron of the bar that night.  Anderson had walked to the bar, so Person offered her a ride home when the bar closed, and she accepted.  Gornall was passed out in the back seat of Person's car.

> Alpena Police Department Officer William Gohl, who was on duty that night in a marked patrol car, observed Person's vehicle after it left the bar and noticed that it had a burnt out passenger side headlight.  Officer Gohl followed the vehicle and observed it stop at a flashing red light at River Street and Second Avenue.  The vehicle stopped well beyond both the white line and the cross walk at the intersection.  Person's vehicle then made a sweeping left turn onto Second Avenue into the right turn lane, and then switched lanes without signaling in order to travel over the bridge.  At this point, Officer Gohl activated his overhead lights.  Both vehicles were traveling at normal speeds at the time.

> Person's vehicle continued without stopping and caught up with another vehicle, then abruptly changed lanes and passed it.  In a portion of her preliminary examination testimony admitted at trial, Anderson testified that at this point she told Person to "just pull over," but Person responded that "he didn't want to go to jail."  Officer Gohl turned on his siren and alerted dispatch that he was following a fleeing vehicle.  Person's vehicle picked up speed and was traveling much faster than Officer Gohl vehicle, which was traveling approximately 70 mph.  Officer Gohl testified that he decided not to increase his speed further because he was approaching an intersection.

> The area had poor lighting, and Officer Gohl became concerned that he would lose sight of the fleeing vehicle, so he turned on his vehicle's spotlight.  As Person's vehicle entered a curve in the road, Officer Gohl saw its brake lights briefly and then could no longer see the vehicle.  Officer Gohl discovered that Person's vehicle had left the roadway, and he could see skid marks and a large plume of smoke or dust in the air.  Person's vehicle had come to rest near a creek bottom, which was approximately a six-foot drop from the roadway.  Officer Gohl advised dispatch of the crash and requested an ambulance.

> As Officer Gohl approached the vehicle, he could see two people inside it.  Officer Gohl first made contact with Anderson, who was groaning in the front passenger seat.  Officer Gohl could not see any major wounds, so he told her to

stay put and approached Person, who was in the driver's seat.  Officer Gohl then noticed Gornall in the grass near the vehicle.  Gornall was breathing but unresponsive.

Additional officers and paramedics responded to the scene, and all three passengers were transported by ambulance to the hospital.  Two officers who responded to the scene reported that, before Person was removed from the vehicle, the odor of intoxicants was present, Person had bloodshot eyes, and Person denied being the driver of the vehicle, despite the fact that he was belted in the driver's seat.  A search warrant was obtained to retrieve a sample of Person's blood.  Testing revealed that Person's blood contained 0.17 grams of alcohol per 100 milliliters of blood.

As part of the investigation into the accident, the air bag module was retrieved from Person's vehicle, which recorded the speed at the time of crash as 87 mph.  In addition, an expert in accident reconstruction determined that the absolute minimum speed of Person's vehicle at the beginning of the visible skid marks was 48 to 50 mph.  The speed limit on Second Avenue is 25 mph.

Dr. Bevin Clayton, an emergency room physician at Alpena Regional Medical Center, testified that he treated Gornall upon his arrival.  Dr. Clayton could feel Gornall's ribs crunching when he attempted CPR.  In addition, Gornall's eyes were fixed and dilated, which Dr. Clayton testified, usually indicates the chance of recovery is less than 1 percent.  Shortly thereafter, Gornall was pronounced dead.  Hospital staff testified that Person, who had been belligerent and threatening, quieted after being told of Gornall's death and stated that Gornall had been dead before the accident.

Gornall's autopsy resulted in the determination that the cause of death was multiple blunt force injuries.  The medical examiner, Kanu Virani, M.D., testified that Gornall had suffered numerous internal and external injuries, including a broken leg, separation of the first, second, and third vertebrae of the neck, lacerations of the lungs and liver, a nearly completely separated kidney, as well as other relatively minor injuries.  Dr. Virani did not note any seat belt marks, which would normally be present when someone is wearing a seat belt and is injured.

*People v. Person*, No. 286057, 2009 WL 3930576, at* 1–2 (Mich. Ct. App. Nov. 19, 2009) (per curiam).

Petitioner's conviction was affirmed on appeal.  *Id.*  Petitioner now seeks a writ of habeas corpus on a single ground, asserting: "Petitioner's conviction for second degree murder should be vacated as the prosecution failed to present legally sufficient evidence that Mr. Person

possessed the essential malice element required to support a conviction for second degree murder, contrary to his constitutional right to due process law."

## II

In his sole claim for relief, Petitioner asserts that there was insufficient evidence to convict him of second-degree murder because the prosecutor failed to establish malice. In other words, the prosecutor did not establish that Petitioner's conduct rose to the level of wanton and willful disregard of the likelihood that his actions would cause death or great bodily harm. The Michigan Court of Appeals rejected Petitioner's claim, explaining:

> The evidence at trial established that Person's blood alcohol level at the time of the accident was 0.17 grams per 100 milliliters—more than twice the legal limit. In addition, Person was traveling at excessively high rate of speed, at least twice the speed limit of 25 mph, perhaps as high as 87 mph. This rate of speed is especially egregious in light of the fact that Person had an unrestrained passenger, passed out and lying down in the back seat. Person failed to pull over when Officer Gohl activated his vehicle's lights and sirens or when Anderson asked him to. Such conduct goes beyond drunken driving and constitutes wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. Taken as a whole and viewed in a light most favorable to the prosecution, the evidence and the reasonable inferences stemming from that evidence was sufficient to support Person's convictions.

*Person*, 2009 WL 3930576, at * 4-5 (internal footnotes omitted).

State courts are to be given great leeway in adjudicating sufficiency of evidence claims. *Thompson v. Bock*, 215 F. App'x 431, 437 (6th Cir. 2007) (citing *Yarborough*, 541 U.S. at 663-64)). When reviewing the sufficiency of the evidence to support a criminal conviction, the inquiry is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). "[T]his inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Id. at 319 (internal quotation marks and emphasis omitted) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). Rather, "the relevant question is whether, after

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis omitted) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).

Under Michigan law, the elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *Stewart v. Wolfenbarger*, 595 F.3d 647, 654 (6th Cir. 2010) (citing *People v. Goecke*, 579 N.W.2d 868 (Mich. 1998)). "[M]alice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* (citing *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980)). Additionally, "[t]he offense of second-degree murder 'does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences.' " *Stewart*, 595 F. 3d at 658 (quoting *People v. Aldrich*, 631 N.W.2d 67 (Mich. Ct. App. 2001)).

Petitioner is correct that not every drunk driving case that results in a death constitutes second-degree murder. *See People v. Werner*, 659 N.W. 2d 688, 692–93 (Mich. Ct. App. 2002) (per curiam). Instead, to satisfy the malice requirement for second-degree murder, the evidence must show " 'a level of misconduct that goes beyond that of drunk driving.' " *Id.* (quoting *Goecke*, 579 N.W.2d at 880).

In this case, the evidence was sufficient for a rational trier of fact to conclude that the petitioner acted with malice. Petitioner was intoxicated; his blood alcohol level was more than twice the legal limit. *See* Mich. Comp. Laws § 257.625(1)(b). Petitioner was first observed by Officer Gohl stopping well beyond an intersection's cross-walk. Petitioner then made a sweeping turn onto another street, switched lanes without signaling, and again abruptly changed

lanes.  Officer Gohl activated his lights and sirens, but Petitioner did not pull over.  He sped up.
His passenger, Jean Anderson, told him to pull over, but he refused, telling her that he did not
want to go to jail.  On a road with a twenty-five mile an hour speed limit, Petitioner began
driving at least fifty miles an hour and perhaps as fast as eighty-seven miles an hour.  Entering a
dimly lit area, Petitioner did not reduce his speed.  (Officer Gohl testified that the area was so
dimly lit he had to activate the spotlight in order to be able to see Petitioner's vehicle.)  Petitioner
continued driving at a high rate of speed through a curve in the road, ultimately losing control of
the vehicle, crashing into a creek bottom.  The force of the crash propelled his victim from the
vehicle, killing him.

Driving a vehicle erratically and at a high rate of speed while intoxicated evinces a
wanton and willful disregard of the likelihood of death or great bodily harm.  The malice
aforethought element of second-degree murder can be inferred from such conduct.  *See
Hoskinson v. Bock*, 8 F. App'x 558, 560–61 (6th Cir. 2001); *Aldrich v. Bock*, 327 F. Supp. 2d
743, 763 (E.D. Mich. 2004); *People v. Miller*, 499 N.W.2d 373 (Mich. Ct. App. 1993).

The Michigan Court of Appeals reasonably determined that a rational trier of fact could
have found the elements of second degree murder, including the element of malice, beyond a
reasonable doubt.  Petitioner is not entitled to habeas relief.

### III

Before Petitioner may appeal this Court's dispositive decision, a certificate of
appealability must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of
appealability may issue "only if the applicant has made a substantial showing of the denial of a
constitutional right."  28 U.S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits,
the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would

find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id*. at 336–37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Petitioner has not demonstrated a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that Petitioner should not be granted leave to proceed in forma pauperis on appeal, as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

**V**

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that permission to proceed in forma pauperis on appeal is **DENIED**.

Dated: May 17, 2012

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 17, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS